So with that, let's go with the first case, which is 22-1389, a state of Nathan Timothy Simon v. Van Beek. You may proceed. Good morning, your honor. Josh Marks on behalf of the appellant. The appellant consists of three supervisory defendants and two patrol deputies. In this case, I'd like to reserve just a few minutes for rebuttal. If it comes to that, if the court is still asking me questions, I am much more interested in answering your questions than I am in coming up with rebuttals. Excellent strategy. Nathan Simon was arrested on August 3rd, 2019, and three, he was taken to the jail in Eagle County, Colorado. Three days later, he was found in a cell. He took his life in that cell. The defendants in this case were, many times you see in these kinds of cases, the jail deputies who were observing that particular inmate before he or she took her life, you see them as defendants. In this case, the defendants were the arresting officers who had contact with Mr. Simon three days before, and then the highest level supervisors involved. And those kinds of claims here are now particularly suited to qualified immunity for two reasons. They're hard claims to prove. And then secondly, the law is really sparse in this area. And so these defendants asserted qualified immunity, and the district court denied it on all grounds. And so we've come to you here on an interlocutory appeal because the district court erred in a number of ways in resolving the qualified immunity. First and foremost, the district court didn't look at the complaint with a good eye towards matching it up with the elements, particularly of deliberate indifference, as to the constitutional violations. And then secondly, when it came to the clearly established law prong of qualified immunity here, the district court, as to the supervisors, totally overlooked that argument or the argument made by those supervisors. And then with respect to the deputies, relied on case law that post-dated the incident. So I think in both respects, the district court's order here is facially deficient. These speakers- I mean, shouldn't the patrol officers have some duty, obligation, responsibility to pass on to the, when they hand off a arrestee to the jail, to pass along information that they have so that there can be a holistic assessment of that person's state of mind, mental condition, and certainly there's a history of suicide threats. It's just a matter of common sense that you'd want a well-trained police force to pass on information they have to the jailer so that a proper assessment can occur. And that really didn't happen here, did it? Well, according to the complaint, the complaint alleges that the two deputies did not convey the parents' concerns of Nathan Simon's suicide onto the jail screening personnel. And so, in a perfect world and looking backwards in this case, one could say it would have been better to pass along those concerns. But in a constitutional sense, this circuit has never had a case where we've dealt with arresting officers and their constitutional obligations in passing information forward. And in this case, the allegations of the complaint are not, don't indicate that there's a clear and obvious risk of suicide. The officers, according to the pleadings, had confronted Mr. Simon while he was in their custody and asked him about the parents' concerns. And Mr. Simon kind of evaded the question and said, hey, I'm just going through a hard time here. I'm having some personal issues. I broke up with my girlfriend. I just don't want to talk about it anymore. He didn't acknowledge, so they had a face to face conversation with Mr. Simon about that. So the deputies here had ambiguous information, conflicting information. So would it be your position that the deputies may have been negligent in not passing along the information, but it's not a case of deliberate indifference because they did look into it and make up their own, reach their own conclusion? Yes, that's our position. And when you look at what their responsibility is, they're arresting deputies, they're transporting this person to the jail. They kept him safe while they had him, dropped him off at the jail, where they knew there was going to be a much fuller kind of assessment process. Because that's what jails do, they have a screening process and they go over jail suicide type questions, or not jails, but just suicide questions, which was done in this case. And that's part of the record. So. Well, the record is, I mean, we're just looking at the complaint, right? This was done on a motion to dismiss. Right, but the complaint referenced the screening quite prominently. And so in the motion to dismiss, we attached a record of that screening as part of the record. So you can consider that. Fair enough. In that regard, though, in our deliberate indifference cases, this court and other courts have talked about defendants functioning in the role of a gatekeeper. And why wouldn't the officers here be considered gatekeepers, given at least the allegations about what the parents told them, responding to 911 calls related to suicide, even the interactions with Nathan Simon. Given all of that, and even if there is some, as you put it, some ambiguity as to whether he's suicidal or not. But even with ambiguity, you take that very seriously, one would think, if there is the possibility of a suicide risk, why couldn't the complaint survive under a gatekeeper theory that in the face of having all that information, they just didn't pass it on? Right, so I think there's kind of a multi-layered answer to your question. It was a multi-layered question. So, the first layer is really, I think you're asking whether or not the gatekeeper concept in the medical care cases should apply here to the jail suicide cases. And it's not a good fit, because as I go back to the Burgas case that you were involved in, as well as Justice, Judge Tinkovich as well from Jefferson County, where at least in the suicide context, the requirements are kind of heightened here. It's gotta be an obvious and kind of imminent risk of suicide. And that was defined in the Burgas case. And so, unlike the gatekeeper concept in medical care cases, that kind of heightened kind of appreciation of a specific risk to an individual is not as transferable to the risk of suicide cases. Because we have, let's go back to the medical care cases, where you have lay people who may not understand what's going on in someone's body, but they see outward symptoms of sign of distress. And this circuit's case law has said, well, in that case, even a lay person who kind of sees that there's some kind of problem, even though they don't know what it is, should be gatekeeping and sending them on to a medical person. And so, that's why that kind of line of cases doesn't work so well with suicides, because you can't size someone up physically and understand whether there's a substantial obvious risk of suicide. But there were other clues here. I mean, statements by loved ones and close observers. So, I agree, it's hard to assess a mental state, but there are other manifestations that were here. Right, but like in Burgas, again, they were conflicting. Like in the Burgas case, there was a significant history of suicide, of prior mental hospitalization, which those deputies had access to through a Tiburon system. It's a jail information management system. I mean, here we have arresting and transporting officers that are one step removed, right, from the jail context, which they have that information. Didn't they witness him crying, for example? Sure, and just like in the Burgas case, I mean, it has acknowledged, this circuit has not found that evidence of mental distress are the kind of clues of the risk of suicide. And then, I mean, that goes back to the Coxby-Glanz case as well. The circuit has consistently said those aren't the kinds of things that are significant enough to communicate the obvious risk of suicide. Well, the intake form at the jail asked whether, and I'm quoting this, the arresting or transporting officer believed subject may be a suicide risk, and then the intake employee checked no. Again, we're on motion to dismiss inferences in favor of the non-moving pleader. Why isn't that evidence, or why wouldn't that support deliberate disregard on the part of the deputies? Well, that was not filled out by the arresting officers. Well, no, but it reports what the transporting officer believed subject may, it's only a may, be a suicide risk. And even if we credit your argument about ambiguity, that would include may. By the way, what's the basis for the ambiguity? I mean, all signals were that there was a suicide risk. But what's the signal that there wasn't one? The most important was when the officers, the transporting officers confront Mr. Simon with the parental concerns, that he doesn't acknowledge that he's a suicide risk, he kind of evades it and says, look it, I'm just having problems, and minimizes the parental concerns, and that's the ambiguity. Does he have to deny it? No, I think he just, he needs to acknowledge it for there to be the kind of obvious and substantial risk of suicide for these officers, because remember, these officers not only have to have  but they also have to draw the inference as part of the elements of deliberate indifference. And one of the allegations is other transporting officers go back to the parents and says, hey, I don't think he's really at risk here. And so there's evidence that he didn't draw that inference here, and because they had some time to deal with Mr. Simon themselves. And oftentimes, in the jail suicide context, the party themselves, the arrestee, is the most important source of information as to whether that risk exists. And so that's why I say there's that kind of ambiguity. I see my time is drawing near. Is there any questions about the supervisory liability claim, because I think that is incredibly clear. The supervisors have to have knowledge of the specific risk of suicide. They don't have to have personal knowledge, and that's the George versus Beaver County case that says that, that requirement. In that case, the sheriff was dismissed on qualified immunity because that evidence wasn't in the record. In this case, the court misconstrued a fax that was sent in the hours before Mr. Simon's demise to the agency as a whole, but there's no allegation that this particular court order got its way into the supervisors, and the face of the order doesn't say anything about suicide. Talks about behavioral health services and an assessment that a court liaison had to do. And that's just like in Burghanst, the mental distress, the observations of mental distress. So I think it's crystal clear, the supervisory defendants, there's no constitutional violation as to them. So let me reserve 20 seconds then for rebuttal. You may come up. Thank you. I'd like to thank the panel for hearing this case. My name is Sean Walsh, and I appear on behalf of the appellees in this case, the estate of Nathan Simon. This was a tragic and preventable case that should have been taken care of on multiple levels, not only from the underlying arresting officers, but all the way up to the supervisory officers. This is a systematic fail that has occurred in Eagle County on multiple cases. There's been six suicides all by hanging in the Eagle County Sheriff's Office, four of which, or three of which have taken place since Nathan Simon took his life on August 5th of 2019. This case comes down to whether a complaint, as the plaintiff alleged, has, if there's been notice of a constitutional violation. The appellants would contend absolutely 100% there has been, because Nathan Simon, in particular, was denied the medical treatment that he required and that he needed. I think the facts in this case and the allegations as asserted in the complaint bear that out. So then the quote. So just playing off that, is it your contention that cases that discuss the failure to provide medical care in general sufficiently establish the suicide risk theory in this case? I don't think it's any medical care. I think it's the, first of all, I think it goes to the substantial risk if they know that there's a specific suicide threat that exists. And secondly, denying or ignoring that suicide risk and denying that medical treatment, and specifically a medical assessment by a qualified mental health professional was what was required in this particular case and denied on every level. The only thing that was done was a screening from the outset by people that were not qualified. Now the appellants want to contend a screening is sufficient for the officers on the underlying case, but that's not the case. And what they did is they took matters in their own hands. Despite being alerted to, well, what they should have been alerted to is three prior instances of Nathan Simon risking his own life. A 911 call specifically by his parents that asserted he is going to kill himself. We need to intervene now. Starting with the patrol officers, what's the kind of the case that you hang your hat on for the clearly established prong of qualified immunity? I would say whether, I would say the appellate or the district court was correct in asserting the Cox opinion, whether the officers had knowledge that Mr. Simon presented a substantial risk of suicide. And based upon his prior history, the history in Eagle County, the 911 calls specifically by the parents that they will contend this was a bond violation of why he was picked up. How do you link up the 911 calls to Mr. Officer Peterson and Officer Oakley? Well, first of all, there should have been a database established by Eagle County. And I mean, that's part of discovering, figuring out. But they can't be responsible for that. Well, they're not responsible for the lack of a database, right? The arresting officers. They should have known about prior emails and calls about Nathan Simon. Well, that should have been. I mean, what's your allegation in the complaint about why they should have known that? I think that if it was properly documented by the sheriff's office, they would have had access to it. The fact they did it, I think goes to the systemic failure within the office. I mean, that's sort of the point. That is an allegation against the office. Sure. And you agree, don't you, that you have to make specific allegations against the officers? Correct. Okay. And that goes into, well, first of all, Officer Peterson arrested Nathan Simon the day before on an unrelated charge, puts him into kind of a downward spiral on himself. He bonds out. The next day, Nathan Simon comes home without his girlfriend, claims he's suicidal, leaves the home. They call 911 and says, please save our son. Officer Peterson then appears back at the parent's house. And they specifically note, do not believe him if he tells you he's not suicidal. That should key off the officer right there and then that this is a suicidal risk. Officer Oakley then has his own interaction with Mr. Simon. And Mr. Simon is breaking down. He's crying in the back of a police car. He states he's having a hard time. And there's such a concern that the officer actually gives him a card that if he needs help, he should talk to somebody. Despite all this, Officer Peterson decides that he's not suicidal. And Officer Oakley decides he's not suicidal. And the only thing that he has to do is go to Burgeon Sharp and the members of WellPath and say he may be suicidal. It's a very low threshold because all the indications are there. Specifically, he's told that he's suicidal and don't believe him. He'll lie if you're confronted on it. Counsel, on the issue of deliberate indifference, the case is divided into an objective element and a subjective element, correct? Correct. The amended complaint alleges that Deputy Peterson returned to the Simon home and told the parents that he thought Nathan was not suicidal. Now, he may have been wrong, but again, there is a subjective element. So why doesn't that show that he was not aware of a substantial risk of harm? Well, Officer Peterson and Officer Oakley, admittedly, are not qualified mental health professionals. They have no training in evaluating suicide. They don't have any educational expertise in that regard. Isn't that also sort of the point? Because we don't hold them to the same standard as we would a psychiatrist who might have run into him. Absolutely. And what should be part of their training is assessing whether someone could be suicidal. And I think the indication from specifically a 911 call, don't believe him if he tells you he's not suicidal, him breaking down and crying and telling him that he's having a hard time, if those aren't indications that there may be a potential problem, specifically when it's told, please arrest my son and thank God that the police came because now he's safe, that's an indication that they shouldn't take upon themselves to make that determination, but rather pass it off to anybody who may be qualified. Well, you know, you used the word should a couple of times there, should have known. That sounds a lot more like negligence than deliberate indifference. Well, I do not, well, I believe they took upon themselves to disregard what was in front of them. And that's not negligence, that's a blatant disregard for someone's medical rights of what they may need. That would be, that's the opinion of the appellants is that at the very least, they had to act if there was something that was present and clear danger in front of them. And they had the mindset that they just didn't care and they were actually obviously trained to disregard any threat that was out there. So how, could you, just coming back to Judge Tinkovich's question about clearly established law, you mentioned Cox, how would the Cox decision have put these deputies on notice that what they did here was a deliberate indifference violation? And I'm not talking about a general statement in the case because as you know, that isn't gonna cut it for clearly established law. So how does Cox map onto this case? Well, I think the Cox decision stands for whether there is a substantial risk. What were the facts in Cox? Well, I mean, there was, what, the individual was denied medical treatment. I believe he was, the medications he wasn't provided and therefore there was a finding specifically of not providing the medical treatment that he was, it was deemed there was a substantial risk that was ignored by the officer. Wasn't it an arresting officer? No, there was not. You don't have an arresting officer case, do you? Where there's a deliberate indifference? No, in that regard, the appellant is right that there is no clear-cut law, in particular in this issue, that's directly on point. However, I believe that the way that this court should interpret this, as they did in Cox and then later in Crane that reaffirmed that, is that when there is a substantial risk that needs to be taken in light of all the facts that are presented in front of the arresting officers. In this case, I believe that the facts present themselves that there was a substantial risk to Nathan Simon and they were specifically told of that risk by the parents and not in so many words by Nathan Simon, who denied his suicide, which they said he would, but obviously in his actions in the back of the patrol car. The arresting officers handed Nathan off to the jail and the suicide didn't occur until two days later. What should we make of the fact, if any, that the temporal separation between the arrest and the suicide, does that matter here, that he was in two days in jail interacting with other Eagle County detention personnel? Well, in a certain way it does, because there's only the initial screening and Ms. Sharp and Wellpath are not provided any information with regard to his potential suicide risk. Had there been anything presented by the officers, then it would have risen the level beyond a screen to actually having a qualified mental health professional do a mental health assessment right there and then. So it continues to ignore the problems that he has and then as it plays out further on, as Nathan Simon is taken into the Eagle County court system and realizes he's not going to bond out yet again, he becomes depressed where the judge actually finds, we think he's a threat to himself and refers him to the Bridges Program in an email that's specifically sent to the Eagle County detention facility, again, ignored by the supervisory liabilities, not necessarily the individual deputies, but another indication that there is notice that he is, again, suicidal and needs this mental health assessment that is not being done. Let's segue to the supervisory defendants here. And what's the, I mean, I want to, again, link up the complaint allegations to C. Van Veek, Van Wick, and McWilliams. What are the allegations that they had personal knowledge of the suicide risk and ignored it? Link up the complaint to those three defendants. Okay, so specifically, I think it starts with the training, the supervision, and how the individual officers are instructed to evaluate suicide risk, which we believe is improper. Secondly, they should have been, well, they were advised of prior threats, specifically two emails by Mr. Simon's girlfriend to the Eagle County Sheriff's Office and a first 911 phone call as early as August 30th. Those defendants were told that? Well, they, if they weren't, I'd be shocked that they were not. Because- What does the complaint allege? Well, that they had knowledge that there was prior suicides and there was prior suicide attempts within the jail itself. But what knowledge did they have about Nathan specifically? Well, specifically in the complaint, it does allege that there was the Bridges program that was referred over to the Eagle County detention facility. And that they needed to act on it. Did those three defendants see the email? Well, in a motion to dismiss, we have to allege that they actually did, and that's the allegations within the complaint. I mean, discovery would actually bear that out as to whether they did or did not. Does the amended complaint allege that they actually saw the email from the judge? It alleges they had knowledge because of the, yeah, it alleges that they had adequate notice specifically, and the district court found that as well. They had adequate notice specifically because of the email that was provided from the court system, hours before Nathan Simon took his own life. And at the very least, they failed to monitor him while he, after he gets discharged from the court system. They left him alone in a cell for two to three hours with a towel over the door and allowed this to take place. Well, I assume there were other jail personnel that were responsible for monitoring the inmates at that point. Yes, but it's the people that promulgate the rules, the policies, the procedures that oversee that. And then, you know, same question as related to the patrol officers. What's the clearly established law that would have put these three, the supervisory defendants, on notice that they're violating the Constitution? Well, I believe that goes, again, back to the Cox decision. I mean, did they have knowledge of substantial risk, and did they have knowledge that he needed a medical right in this case? Was there supervisory liability in that case? In which case, Cox? I don't believe there is, no. I believe, well, actually, quite frankly, I don't know. I think it goes more to the jail personnel that were overseeing the number. It seems like some of these arguments sound a little bit more as official capacity claims than individual capacity claims. But you didn't bring a Monell claim. There is a Monell claim, it just was not appealed. It's just not on appeal. Correct, so yeah, that's already been resolved. And that claim will move forward. So yeah, and I think to your point, there are two different theories that we have. One is the individual officer's liability based upon their knowledge of the specific risk, and then two, the supervisory claims, specifically with the email in place. And as it's alleged in a 42-page complaint, also, I think if you look at page 23 of our appellate brief, it cites A through R, the specific problems that we have with the supervisory liability. So the appellees would contend it's not as clear as the appellants want to make it in this case, and that their failure to screen and actually provide a qualified mental health professional, as low as that bar would have been, we think he's suicidal, would have prevented this whole thing and none of us would be here today. And that's the true tragedy that exists within this case. I guess in conclusion, what I would say is, given the failure of Eagle County in this case on multiple levels, we believe that it warrants a denial of qualified immunity on both the individual level as they failed to establish that there was concerns, they failed to communicate it, even with fellow officers. Not just who they pass it off to, but there's no emails or anything else that's even referenced to anybody else that could actually look at this. They failed to monitor him after his knowledge and they failed to supervise. There was obviously prior hangings, 911 calls, and failed to get involved even after the court begged them to do so. Failing to obtain a qualified mental health professional, either at the beginning of this case or at the end of it, when he reached his bailout, was obviously a very key factor in contributing to his suicide in this case. And again, we believe that deliberate indifference prevents qualified immunity from being applied in this case, specifically under Cox, as Eagle County had actual knowledge of this suicidal risk. Thank you for your time. Thank you, counsel. Greg, could you give him a minute for rebuttal? Yes, sir. OK, I'll try to make this very brief. Your clearly established law analysis, if you look at Taylor v. Barks, the US Supreme Court case that dealt with jail suicides, this court's jurisprudence in Cox and later on in Crane, every one of those look at suicide cases for the clearly established law analysis. They don't go and look at other kinds of medical care cases. Counsel, could I just ask you about one point that's been made about the intake step in this situation? Do you agree that there wasn't someone at intake who could make a mental health assessment who was not qualified, or there was no one qualified to make a mental health assessment? Yeah, it kind of flows from a false premise. The screening, we're talking about a screening level. And there is no requirement for a qualified mental health professional to do that initial screening. If the screening finds that someone may be at risk of suicide, they then bring in the qualified mental health professional to do the suicide evaluation in the jail. So that's the false premise, that you don't have psychiatrists, you don't have psychologists doing the initial screening. It sounds a little bit like a chicken and egg problem, because someone has to decide if there's a suicide risk in order to bring someone in to decide whether there's a suicide risk. Well, there's a series of questions that are outlined in the screening process, and that's in the record, to help trigger that recognition. And there's instructions about- That's attached to the complaint? Yes, correct. Bottom line, Eagle County does not have a policy where every arrestee is seen by a medical professional? If they eventually stick around and are in general population long enough, yes, the medical people do. And in fact, the medical people did the second screen that's done in Eagle County is done by the health care provider, which is the second screen. Pardon me? When is the second screen? That's initially. There's a deputy level, a deputy does a screen, and then a medical professional, in this case, who is an EMT, did the second level screen. Was that done before Nathan Simon was placed in the general population? Yes. Right, counsel, thank you. Your time's expired. We appreciate the arguments. Your excuse in the case shall be submitted. Thank you.